## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK-ALONZO WILLIAMS,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 1:17-cv-79** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **WARDEN JOHN** | : | |
| **WETZEL,** *et al.*, | : | |
| **Defendants** | : | |

### MEMORANDUM

This matter is before the Court pursuant to the motion for summary judgment filed by Defendants James C. Barnacle ("Barnacle"), Norman Demming ("Demming"), Joseph Fye ("Fye"), Michael Klopotoski ("Klopotoski"), Michael Mahally ("Mahally"), Vincent Mooney ("Mooney"), Captain Pall ("Pall"), John Wetzel ("Wetzel"), and Joseph Zakarauskas ("Zakarauskas") (Doc. No. 140) as well as *pro se* Plaintiff Mark-Alonzo Williams ("Plaintiff")'s motions to amend (Doc. Nos. 156, 157) his brief in opposition (Doc. No. 154) to the motion for summary judgment. All motions are ripe for disposition.

## I.    BACKGROUND

Plaintiff is a state inmate who is presently incarcerated at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon"). He initiated the above-captioned case by filing a complaint pursuant to 42 U.S.C. § 1983 and a motion for leave to proceed *in forma pauperis* in the United States District

Court for the Western District of Pennsylvania. On January 11, 2017, that court transferred the matter to this Court for further proceedings. (Doc. No. 8.) Plaintiff is proceeding on his second amended complaint, filed on September 26, 2017. (Doc. No. 52.)

Plaintiff alleges that on September 23, 2014, while incarcerated at SCI Dallas, he received a "death threat letter" from inmate Jason Bader. (*Id.* ¶¶ 21-22.) He gave the letter to Officer Petrosky, who gave it to Defendant Pall. (*Id.* ¶ 24.) Bader was placed in the Restricted Housing Unit ("RHU"). (*Id.* ¶ 25.) Fifteen (15) days later, Bader was released. (*Id.* ¶ 28.) That same day, Plaintiff was sexually assaulted by Bader in Plaintiff's cell on G block. (*Id.* ¶¶ 30-39.) Plaintiff locked Bader in the cell and ran to Defendant Fye and C.O. Levan for assistance. (*Id.* ¶¶ 42-45.) Defendant Fye and C.O. Levan removed Bader from Plaintiff's cell and detained him in a mop closet until RHU officers arrived. (*Id.* ¶ 50.) Plaintiff requested medical treatment but was denied. (*Id.* ¶¶ 56-58.)

Plaintiff subsequently used the G block telephone to call the Prison Rape Elimination Act ("PREA") hotline to report the sexual assault. (*Id.* ¶ 59.) Based on conversations with C.O. Levan and Defendant Demming, Plaintiff believed that Bader would be transferred to another institution. (*Id.* ¶¶ 55, 67.) On December 5, 2014, Plaintiff met with Defendant Pall. (*Id.* ¶ 70.) According to Plaintiff,

Defendant Pall indicated that Plaintiff's homosexuality provoked the assault and stated that it was "50/50" as to whether Plaintiff or Bader would be transferred. (*Id.* ¶¶ 73-75.)

On December 19, 2014, Plaintiff was transferred to SCI Coal Township and Bader was released back to general population at SCI Dallas. (*Id.* ¶¶ 79, 82.) Plaintiff alleges that this transfer was retaliatory and that various Defendants colluded in the transfer. (*Id.* ¶¶ 85, 89.) While at SCI Coal Township, Plaintiff learned that he had suffered a kidney injury and that he had an inmate separation there. (*Id.* ¶¶ 85, 99.) Plaintiff informed staff at SCI Coal Township about the inmate separation, and he was transferred to SCI Graterford on January 15, 2015. (*Id.* ¶¶ 98, 100.)

Seventeen (17) days later, Plaintiff was transferred back to SCI Coal Township. (*Id.* ¶ 101.) He informed staff there that he was at risk, and on March 21, 2015, Plaintiff was assaulted by another inmate. (*Id.* ¶¶ 102-03.) He alleges that Defendants Mooney, Klopotoski, Barnacle, and Wetzel retaliated against him by "approving a transfer to SCI Fayette where Plaintiff learned he had inmate separations." (*Id.* ¶ 106.) On March 23, 2016, Plaintiff was assaulted by another inmate. (*Id.* ¶ 112.) He was transferred to SCI Forest, where he had another inmate separation, on October 6, 2016. (*Id.* ¶ 116.) Plaintiff alleges that, ultimately,

Defendants approved his placement in a Special Management Unit ("SMU"), and he was transferred to a SMU at SCI Camp Hill, where he does not have inmate separations. (*Id.* ¶¶ 120-22.)

Based on the above, Plaintiff alleges that Defendants violated his First Amendment rights by retaliating against him, his Eighth Amendment rights by failing to protect him from inmate assaults and denying him medical care, and his Fourteenth Amendment rights by causing him to be denied parole and by denying him equal protection because he, as a homosexual inmate, was not afforded the same protections as heterosexual inmates. Plaintiff also suggests that Defendants conspired to violate his rights, failed to comply with PREA, and violated several sections of the Pennsylvania Crimes Code. (*See id.* ¶¶ 142-203.)[1] He requests declaratory and injunctive relief, as well as damages. (*Id.* at 40-41.)

---

[1] Plaintiff also vaguely suggests that Defendants violated his "right to enjoy the protections of the [Americans with Disabilities Act ("ADA")]." (Doc. No. 52 ¶ 203.) "Title II of the [ADA] which prohibits a 'public entity' from discriminating against a 'qualified individual with a disability' on account of that individual's disability, covers inmates in state prisons." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998) (quoting 42 U.S.C. §§ 12141 & 12132). While the United States Court of Appeals for the Third Circuit has not addressed the issue precedentially, most courts "have held that Title II does not authorize suits against government officers in their individual capacities." *Williams v. Hayman*, 657 F. Supp. 2d 488, 502 (D.N.J. 2008); *see also Bowens v. Wetzel*, 674 F. App'x 133, 136 (3d Cir. 2017) (noting that "the District Court could have properly followed the holdings of those circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim"). Accordingly, Plaintiff cannot maintain an ADA claim against Defendants in their individual capacities.

Plaintiff also cannot maintain an ADA claim against Defendants in their official capacities. A plaintiff bringing a claim under Title II of the ADA must allege: "(1) that [he] is a qualified

## II.   PLAINTIFF'S MOTIONS TO AMEND

As noted above, Plaintiff has filed two (2) motions for leave to amend his brief in opposition to Defendants' motion for summary judgment.  (Doc. Nos. 156, 157.)  In these motions, Plaintiff seeks to further address Defendants' arguments regarding personal involvement and to present further exhibits to the Court.   Defendants maintain that the Court should ignore these filings because they are "blatant attempt[s] to circumvent the page limits imposed by the Court for the Plaintiff's brief, along with a violation of the Local Rules to submit a brief in 'sub-parts,' as the Plaintiff has done here."  (Doc. No. 163 at 6.)  Defendants, however, have addressed the arguments Plaintiff raises in his motions.  (*Id.*)

In an Order dated November 13, 2019, the Court granted Plaintiff's motion for leave to file a brief in opposition that exceeded fifteen (15) pages.  (Doc. No. 152.)  Specifically, the Court indicated that Plaintiff's brief could total thirty (30) pages because that is the length he requested in his motion.  (*Id.*)  Given that the majority of Plaintiff's brief in opposition is handwritten, however, it appears that

---

individual with a disability; (2) that [he] was either excluded from participation in or denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and, (3) that such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability." *Douris v. Dougherty*, 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002).  Nothing in Plaintiff's second amended complaint plausibly suggests that he was prevented from participating in any DOC services, programs, or activities because of any disabilities.  Thus, there is no plausible basis on which Plaintiff's ADA claims could proceed.

Plaintiff underestimated the number of pages he would require to address Defendants' arguments. Moreover, while Local Rule 7.8(a) does provide that "[n]o brief may incorporate by reference all or any portion of any other brief," the Court concludes that, given Plaintiff's status as an incarcerated *pro se* litigant, the interests of justice weigh in favor granting him leave to amend his brief in opposition. Accordingly, the Court will grant Plaintiff's motions for leave to amend his brief (Doc. Nos. 156, 157) and consider the arguments presented therein in its discussion of Defendants' motion for summary judgment.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v.*

*York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to

show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders

and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## B. Statement of Undisputed Facts[2]

On September 23, 2014, an unidentified inmate handed Plaintiff a letter that contained a death threat from inmate Jason Bader. (Doc. No. 142 ¶ 2.) Plaintiff gave the letter to C.O. Petrosky, who then gave it to Defendant Pall. (*Id.* ¶ 3.) Bader was placed into the RHU pending an investigation. (*Id.* ¶ 4.)[3] Fifteen (15) days

---

[2] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.* Here, Plaintiff filed two (2) responses to Defendants' statement of material facts in compliance with M.D. Pa. 56.1. (Doc. Nos. 148, 170.) Plaintiff has also filed a verified second amended complaint, which may be treated as an affidavit in opposition to summary judgment. *See Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003) (noting that "the complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)"); *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion); *see also Boomer v. Lewis*, No. 06-850, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge."). Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

[3] Plaintiff adds that Bader was placed in the RHU immediately after C.O. Petrosky gave the death threat letter to Defendant Pall. (Doc. No. 148 ¶ 4.)

later, Defendant Pall "permitted security personnel to release inmate Bader back to cellblock B." (*Id.* ¶ 5.)[4] That same day, Bader "assaulted the Plaintiff on G block by punching and kicking him numerous times." (*Id.* ¶ 6.)[5] Plaintiff managed to lock Bader inside the cell and ran to Defendant Fye and C.O. Levan for help. (*Id.* ¶ 8.) Defendant Fye and C.O. Levan detained Bader until security arrived. (*Id.*)[6] After the assault, Plaintiff asked to go to medical, but C.O. Levan refused and told him to ask to go in the morning. (*Id.* ¶ 9.)[7] The following morning, Plaintiff asked C.O.

---

[4] G and B blocks are "on opposite sides of a fence and connected via a concrete pathway." (Doc. No. 142 ¶ 7.) Plaintiff maintains that the Program Review Committee ("PRC"), consisting of Defendants Mahally, Zakarauskas, Pall, and Demming voted to not extend the investigation and, therefore, released Bader from the RHU. (Doc. No. 148 ¶ 5; Doc. No. 170 ¶ 5.) Plaintiff also asserts that Bader went to B block to drop off his property, came to G block, "received clearance from Defendant Fye, and hid in [Plaintiff's] cell after Defendant Fye unlocked it for open access." (Doc. No. 170 ¶ 5.)

[5] Plaintiff adds that Bader was "tucked into the shadows of the cell [and] stood naked from the waist down." (Doc. No. 148 ¶ 6.) Plaintiff maintains further that Bader stabbed him with a sharp object and attempted to remove Plaintiff's pants. (*Id.*; Doc. No. 170 ¶ 6.) In his second amended complaint, Plaintiff states that he "felt a sharp stabbing pain at his lower back area" but does not mention a sharp object. (Doc. No. 52 ¶ 40.)

[6] Plaintiff maintains that Defendants have "willfully and intentionally" omitted the fact that Defendant Fye and C.O. Levan permitted Bader to ransack Plaintiff's cell and the fact that they were "laughing and joking with inmate Bader as he attempted to bargain with them for his release before more security arrived from the RHU to G block." (Doc. No. 170 ¶ 8.)

[7] Plaintiff maintains that Defendant Fye also refused him permission to go to medical. (Doc. No. 148 ¶ 9.) He further asserts that he was holding his side when he asked to go to medical. (Doc. No. 170 ¶ 9.)

Bolka if he could to go medical, but never heard back.  (*Id.* ¶ 10.)[8]

Subsequently, Defendant Pall told Plaintiff that "it was 50-50 that inmate Bader would be transferred," despite Plaintiff's belief that Bader would be transferred.  (*Id.* ¶ 12.)[9]  The Office of Population Management ("OPM") authorizes transfers.  (*Id.* ¶ 13.)[10]  Plaintiff was subsequently transferred to SCI Coal Township. (*Id.* ¶ 14.)[11]  After a temporary transfer to SCI Graterford, he was transferred back to SCI Coal Township.  (*Id.* ¶ 15.)[12]  While at SCI Coal Township, "Plaintiff saw

---

[8] Plaintiff maintains that he never received medical treatment after the assault while at SCI Dallas. (*Id.* ¶ 10.)  He asserts that it was "standard operating procedure" after any sexual assault for inmates to go to the infirmary.  (Doc. No. 148 ¶ 11.)

[9] Plaintiff argues that Defendant Demming told him that Bader "should be transferred and put it in writing in his own stationery."  (Doc. No. 170 ¶ 12.)  Plaintiff also faults Defendants for omitting the fact that Bader worked for Defendants Zakarauskas and Pall as an informant, that Defendant Pall's efforts in keeping Bader at SCI Dallas were "possibly undermined by the fact that Plaintiff was writing defendant Demming *behind-the-scenes* seeking his interference," and that Defendant Pall "exhibited bare animus towards Plaintiff being gay on 5th December 2014."  (Doc. No. 148 ¶ 12.)

[10] Plaintiff maintains that OPM "only 'authorizes' what supervisory defendants submit as memos, recommendation and/or evidence within a 11.1.1. Transfer Referral for review and processing." (*Id.* ¶ 13.)  He asserts further that OPM defers to recommendations made regarding what prison an inmate should be transferred to.  (*Id.*; Doc. No. 170 ¶ 13.)

[11] Plaintiff maintains that this transfer was retaliatory because "SCI Dallas supervisory defendants 'knew and disregarded' inmate separations Plaintiff had which were confined at SCI Coal Township."  (Doc. No. 148 ¶ 14.)

[12] According to Plaintiff, his transfer to SCI Graterford was permanent.  (*Id.* ¶ 15; Doc. No. 170 ¶ 15.)  Plaintiff maintains that Defendants Mooney and Klopotoski "ordered the re-called transfer back to SCI Coal Township, knowing [Plaintiff] was at risk of harm having separations there at SCI Coal Township." (Doc. No. 170 ¶ 15.)  Plaintiff maintains further that Defendant Mooney, Security Captain Stetler, and Psychology Services Agent Kluck knew that inmate Fetterolf posed a threat towards Plaintiff at SCI Coal Township, disregarded that threat, and therefore "depriv[ed]

inmate Jennings, with whom he had a separation, once in the medical department." (*Id.* ¶ 16.) Plaintiff also "became aware of an inmate Tuttles, whom he also had a separation with, being at Coal Township, but did not see him while he was there." (*Id.* ¶ 17.)[13]

Plaintiff was subsequently transferred to SCI Fayette. (*Id.* ¶ 18.)[14] While there, Plaintiff "saw an inmate Sierra (whom he had a separation with) once in the cafeteria." (*Id.* ¶ 19.)[15] While at SCI Fayette, Plaintiff "was involved in an altercation with an inmate Duffy . . ., but had not had any issues with him prior to that altercation." (*Id.* ¶ 20.)[16] Plaintiff was transferred to SCI Forest, where he had

---

Plaintiff of the right to be free from physical assault which occurred on 23rd March 2015 when Plaintiff was forced to protect [himself] when attacked by inmate Fetterolf." (Doc. No. 148 ¶ 15.)

[13] Plaintiff claims that he contacted Captain Stetler "about the inmate separations within his general population; a physical threat to Plaintiff." (Doc. No. 148 ¶ 16.)

[14] Plaintiff maintains that Unit Manager Ritchey submitted the transfer referral, and that the referral omitted the fact that Plaintiff had a separation against inmate Sierra, who was at SCI Fayette. (Doc. No. 170 ¶ 18.) Plaintiff asserts that Defendant Mooney exacted another retaliatory transfer against him and that "it was meant to punitively detach Plaintiff from his loved ones and/or visitations." (*Id.*; Doc. No. 148 ¶ 18.)

[15] Plaintiff maintains that Defendants refuse to add inmate Sierra, Tuttles, and others to Plaintiff's separations list. (Doc. No. 148 ¶ 19.)

[16] Plaintiff states that Duffy "hurled homophobic insults and racial slurs at Plaintiff prior to the physical assault. (*Id.* ¶ 20.) He maintains further that Duffy was "contracted by the inmate-separation to physically harm [Plaintiff] on his behalf." (Doc. No. 170 ¶ 20.)

two (2) inmate separations, in October of 2016.  (*Id.* ¶¶ 21-22.)[17]  "One inmate sent a threatening affidavit to the Plaintiff stating that he would harm the Plaintiff if the Plaintiff was released to general population."  (*Id.* ¶ 23.)[18]

## C.    Discussion

### 1.    Plaintiff's Challenges to Discovery Rulings

As an initial matter, in his brief in opposition, Plaintiff continues to attempt to relitigate several prior discovery rulings made by the Court.  (Doc. No. 155 at 25-27.)  Specifically, Plaintiff once again challenges Magistrate Judge Carlson's March 14, 2019 Order granting in part and denying in part Plaintiff's motion to compel.  (Doc. No. 104.)  Plaintiff, however, filed two (2) motions for reconsideration of that Order, one of which was partially granted by the Court on July 2, 2019.  (Doc. Nos. 124, 125.)  Plaintiff's use of his brief in opposition to again challenge discovery rulings is improper, and the Court, therefore, will not consider such challenges again.

---

[17] Plaintiff maintains that he "languished in the RHU for 7 months at SCI Fayette" and was denied medical care during that time.  (Doc. No. 148 ¶ 21.)  He also asserts that he was immediately placed in the RHU when he was transferred to SCI Forest and that at no time was he "in general population at SCI Forest because it was another retaliatory [transfer] where Plaintiff had an inmate separation."  (Doc. No. 170 ¶ 21.)

[18] Plaintiff states that inmate Arce is the one who sent the threatening affidavit.  (Doc. No. 148 ¶ 23; Doc. No. 170 ¶ 23.)

## 2. Plaintiff's First Amendment Claims

### a. Redress of Grievances

Plaintiff asserts that Defendants interfered with his First Amendment right to seek redress of his grievances by not replying to his grievances, "[barring] any subsequent appeals and/or administrative relief." (Doc. No. 52 ¶ 198.) Prisoners, however, do not have a constitutional right to prison grievance procedures. *See Heleva v. Kramer*, 214 F. App'x 244, 247 (3d Cir. 2007). Thus, a prison official's failure to investigate or respond favorably to an inmate's grievances does not constitute a constitutional violation. *See Stringer v. Bureau of Prisons*, 145 F. App'x 751, 753 (3d Cir. 2005); *Thibodeau v. Watts*, No. 1:05-cv-2505, 2006 WL 89213, at *5 (M.D. Pa. Jan. 6, 2006). Moreover, while "[p]risoners do have a constitutional right to seek redress of their grievances from the [G]overnment, . . . that right is the right of access to the courts, and this right is not compromised by the failure of the prison to address his grievances." *See Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa. 1997).

To the extent Plaintiff alleges Defendants violated his right to access the courts, he cannot maintain such a claim. To sustain such a claim, an inmate must demonstrate an "actual injury" to his litigation efforts. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996). To establish an actual injury, an inmate must show that a non-

frivolous legal claim had been frustrated or was being impeded.  *See id.*; *see also* *O'Connell v. Williams*, 241 F. App'x 55, 57 (3d Cir. 2007).  "[A]n inmate cannot establish a relevant actual injury simply by establishing that his prison's law library or legal assistance . . . is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351; *see also Monroe v. Beard*, 536 F.3d 198, 206 (3d Cir. 2008) (observing that a "claim rest[ing] solely on the ground that the defendants confiscated . . . legal materials" is insufficient on its face to support a denial of access to the courts claim).

Plaintiff contends that Defendants conspired with officials at SCI Camp Hill to have his legal property seized from June 27, 2017 until August 16, 2017, causing him to miss the deadline to respond to Defendants' motion to dismiss previously filed in this matter.  (Doc. No. 52 ¶ 178.)  He maintains that this seizure gave Defendants "an unfair advantage in defending [themselves] against Plaintiff's claims by reading his legal papers and destroying his legal papers." (*Id.* ¶ 179.)  The docket for the above-captioned case, however, reflects that on August 22, 2017, Plaintiff filed a motion for leave to file a second amended complaint (Doc. No. 42), and filed a motion for an extension of time to respond to Defendants' motion to dismiss (Doc. No. 44) a day later.  In a Memorandum and Order dated September 26, 2017, the Court granted Plaintiff's motion for leave to file a second amended complaint, directed the Clerk of Court to docket the second amended complaint, and denied as

moot Defendants' motion to dismiss and Plaintiff's motion for an extension of time to respond to the motion to dismiss.  (Doc. Nos. 50, 51.)  Although Defendants filed a motion to dismiss the second amended complaint on November 16, 2017 (Doc. No. 61), the docket reflects that Plaintiff opposed that motion (Doc. No. 63), and the Court subsequently denied the motion to dismiss (Doc. No. 72, 73).  There is no evidence before the Court to suggest that Defendants read and destroyed Plaintiff's legal papers, and the docket reflects that Plaintiff has been able to submit numerous documents and exhibits in this matter.  Thus, Plaintiff has failed to demonstrate that Defendants caused an "actual injury" to his litigation efforts.  *See Lewis*, 518 U.S. at 349.  Accordingly, the Court will grant Defendants summary judgment as to Plaintiff's claims that Defendants violated his First Amendment right to redress his grievances and access the courts.

### b.    Retaliation

Plaintiff alleges further that Defendants violated his First Amendment right to be free from retaliation when they transferred him to prisons where there were inmates with which he had separations (SCI Coal Township, SCI Fayette, and SCI Forest).  (Doc. No. 52 ¶¶ 149-150.)  Plaintiff maintains that these transfers were in retaliation for his use of the grievance system as well as his submission of a PREA complaint concerning Bader's assault.  (*See* Doc. No. 155.)

16

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with

evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

In the instant case, Defendants concede that filing a PREA complaint and grievances constitutes protected activity. (Doc. No. 141 at 15); *see also Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011) (grievances); *Singleton v. Shearer*, No. 1:17-cv-1027, 2019 WL 3337060, at *5 (M.D. Pa. July 25, 2019) (PREA complaint).[19] Thus, the Court will consider the second and third prongs of a retaliation claim below.

---

[19] In their brief in support, Defendants state that "as to the filing of grievances, it appears that Plaintiff filed a grievance after each supposedly-retaliatory transfer." (Doc. No. 141 at 15.) They assert, therefore, that "[t]o the extent he is attempting to say that his grievances were the 'substantial or motivating factor' for the retaliatory transfers, this makes no sense, as his filing a

### i. Adverse Action

To be actionable under § 1983, the adverse action "need not be great" but "must be more than *de minimus*." *See McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006). As noted *supra*, Plaintiff alleges that his several transfers constitute adverse action. Defendants argue that "it is unclear that a prison transfer, standing alone, would constitute an adverse action for retaliation purposes," and cite *Rauser* in support. (Doc. No. 141 at 16.) In *Rauser*, the Third Circuit noted that the inmate "ha[d] produced evidence that he was denied parole, transferred to a distant prison where his family could not visit him regularly, and penalized financially." *Rauser*, 241 F.3d at 333. This Court has noted that "under some circumstances, a prison transfer may constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Chruby v. Bearjar*, No. 3:17-cv-1631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018), *Report and Recommendation adopted*, 2018 WL 4507599 (M.D. Pa. Sept. 19, 2018).

Here, Plaintiff asserts that, at least with respect to his transfer to SCI Fayette, that "it was meant to punitively detach Plaintiff from his loved ones and/or

---

grievance *after* he was transferred cannot have been the reason he was transferred." (*Id.*) In their reply brief, they observe that Plaintiff's "oppositional brief appears to confirm that his PREA complaint, rather than his grievances, is what constituted the protected activity." (Doc. No. 163 at 7 n.2.) In any event, a liberal construction of Plaintiff's second amended complaint would suggest that he is alleging that he was transferred to a new institution where he had inmate separations *after* filing a grievance concerning his previous transfer.

visitation." (Doc. No. 148 ¶ 18.)  The Court agrees with Defendants, however, that

Plaintiff has failed to present evidence that family was unable to visit him after these

transfers.   Plaintiff does aver that his numerous transfers caused a parole

recommendation to be revoked and that he would have been paroled by March of

2015 if Defendants had not retaliated against him.  (Doc. No. 52 ¶¶ 183, 187.)  As

noted *supra*, Plaintiff's verified second amended complaint may be treated as an

affidavit in opposition to summary judgment.  *See Ziegler*, 77 F. App'x at 120.  In

light of these averments, made under the penalty of perjury, the Court concludes that

Plaintiff has met the adverse action prong for his retaliation claim.  *See Rauser*, 241

F.3d at 333; *Wolfe v. Pa. Dep't of Corr.*, 334 F. Supp. 2d 762, 774 (E.D. Pa. 2004)

(negative parole recommendations constitute adverse actions).

### ii.    Causal Link

Defendants argue that Plaintiff cannot establish causation for his claims

because he has not demonstrated that they were personally involved in his transfers

to SCI Coal Township, SCI Fayette, and SCI Forest.  (Doc. No. 141 at 18-25.)  While

causation may be stablished by direct or circumstantial evidence, "motivation is

almost never subject to proof by direct evidence."  *Watson*, 834 F.3d at 422.  Thus,

motivation is typically demonstrated by "evidence of either (1) an unusually

suggestive temporal proximity between the protected activity and the allegedly

20

retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."  *Id.*  The Court considers each transfer in turn below.

### a.    First Transfer to SCI Coal Township

Plaintiff alleges that he was first transferred to SCI Coal Township approximately two (2) months after he submitted a PREA complaint concerning Bader's assault.  (Doc. No. 52 ¶¶ 59, 79.)  Plaintiff maintains that prior to the transfer, C.O. Levan told him that Bader was "definitely getting transferred."  (*Id.* ¶ 55.)  Plaintiff also maintains, however, that Defendant Pall told him that "it was 50/50 who he would transfer from SCI Dallas: Plaintiff or his assailant."  (*Id.* ¶ 75.)

In his deposition, Plaintiff named Defendants Mahally, Zakarauskas, Demming, and Pall as the ones responsible for his transfer to SCI Coal Township. (Doc. No. 142-1 at 52.)  As an initial matter, the evidence of record establishes that Defendants Mahally and Zakarauskas had no personal involvement in Plaintiff's transfer to SCI Coal Township.  (Doc. No. 142-2 at 51, 72-73 (noting that the Office of Population Management authorized transfers, not them).)  Plaintiff has presented no evidence, except for his unsupported speculations, to create a genuine issue of material fact regarding their lack of involvement.

Defendants Pall and Demming, in their responses to Plaintiff's interrogatories, averred that they did not authorize or direct Plaintiff's transfer.  (*Id.* at 6, 28.)  During

his deposition, Plaintiff referred to an October 15, 2014 memorandum from Defendant Pall to Defendant Demming. (Doc. No. 142-1 at 52.) Plaintiff has provided a copy of that memorandum in his exhibits submitted with his brief opposing summary judgment. That memorandum states:

An investigation was initiated at the request of PRC concerning the need for a separation between Inmates FL2923 Wiliams and [redacted] Bader.

On 10.8.14 Inmate [redacted] Bader, housed on B Block, was discovered in the cell of FL2923 Williams who was housed on G Block. Inmate Bader received misconduct [redacted] and was charged with Threatening Another Person and Presence in an Unauthorized Area. Inmate Bader was sanctioned with 30 days disciplinary custody.

Inmate Williams has since offered testimony Inmate Bader has systematically threatened, extorted, and sexually harassed him. Inmate Williams reports associates of Inmate Bader would present him with notes demanding he attend yard periods.

Both inmates were summoned to the security office and questioned concerning the allegations. It was determined there was a homosexual relationship that has since soured and led to shared contempt. Noteworthy are mutual threats of retaliation.

Based on Inmate Williams' claims Bader[']s associates have participated in his harassment, and the potential for the violence sometimes associated with this type of activity, the security office requests the transfer of Inmate Williams and the continued confinement of Inmate Bader until Inmate Williams is relocated.

(Doc. No. 155 at 38.) Plaintiff suggests that Defendant Pall lied when he said that he and Bader had been in a relationship and that Bader's associates participated in the harassment. (Doc. No. 142-1 at 53; *see also* Doc. No. 155 at 12.) Plaintiff,

however, has not presented any evidence to support his assertions that these statements were fabricated. Indeed, Plaintiff's other exhibits demonstrate that Plaintiff submitted a complaint that associates of Bader's had gang-raped him in July of 2014. (*See* Doc. No. 154 at 66-67; Doc. No. 155 at 43, 49.)

Even if Defendant Demming and Pall recommended that Plaintiff be transferred from SCI Dallas, there is nothing in the record suggesting that they knew that Plaintiff had inmate separations at SCI Coal Township and directed that he be transferred there to place him in harm's way. Plaintiff has simply presented no evidence that Defendants Demming, Pall, Mahally, and Zakarauskas transferred him to SCI Coal Township because of his submission of a PREA complaint and various grievances. *See Abney v. Basial*, No. 1:16-cv-350, 2020 WL 488893, at *7 (M.D. Pa. Jan. 30, 2020) (denying retaliation claim because "[i]t is not enough for Abney to introduce evidence that Basial directed him to be transferred to SCI Camp Hill; there must be evidence of a causal connection between Abney engaging in conduct protected by the First Amendment and Basial's subsequent decision to transfer him to SCI Camp Hill"). Moreover, the passage of two (2) months from the time when Plaintiff submitted his PREA complaint until he was transferred to SCI Coal Township is not unusually suggestive to infer causation. *See Liddick v. Tritt*, No.

1:14-cv-1813, 2018 WL 3639858, at *7 (M.D. Pa. June 29, 2018), *Report and Recommendation adopted*, 2018 WL 3631872 (M.D. Pa. July 31, 2018).

### b. Second Transfer to SCI Coal Township

Plaintiff also maintains that Defendants Mooney, Klopotoski, and Barnacle retaliated against him by "[ordering] another emergency transfer to bring Plaintiff back to SCI Coal Township" seventeen (17) days after Plaintiff had been transferred to SCI Graterford. (Doc. No. 52 ¶ 101.) He alleges that he told security and counselor Christian and P.P.S. Kluck that he was in danger, and that on March 21, 2015, he was assaulted by inmate Fetterolf. (*Id.* ¶¶ 102-103.)

Upon review of the record, the Court agrees with Defendants that Plaintiff has failed to demonstrate that these Defendants transferred him back to SCI Coal Township because of his use of the grievance system and his decision to file a PREA complaint. As an initial matter, Plaintiff has not provided evidence to suggest that Defendant Barnacle was involved in this transfer, and the evidence of record establishes that he was not. (Doc. No. 142-2 at 93.) In his deposition, Plaintiff mentioned how Defendants Mooney and Klopotoski used to be employed at SCI Dallas and that this transfer was their way "of still imposing their retaliation" because Plaintiff "filed many a grievance[] at Dallas when Mooney used to be the Captain there." (Doc. No. 142-2 at 70-71.) Plaintiff has not presented any evidence

24

to support these speculations, and in any event, the length of time that passed from when Defendants Mooney and Klopotoski were employed at SCI Dallas and when Plaintiff was transferred back to SCI Coal Township is not an unusually suggestive temporal proximity for causation purposes. *See Burt v. Lane*, No. 1:16-cv-1180, 2017 WL 4681807, at *9-10 (M.D. Pa. Apr. 4, 2017) (collecting decisions indicating that temporal proximities of seventeen (17) days, three (3) weeks, seven (7) weeks, and between one (1) to three (3) months all were insufficient to establish causation and finding that a six-month temporal gap defeated the inmate's retaliation claim).

Plaintiff avers further in his deposition that counselor Christian told him that Defendants Mooney and Klopotoski were responsible for his transfer back to SCI Coal Township. (Doc. No. 142-1 at 70-71.) Defendants assert that this statement "is unsubstantiated hearsay." (Doc. No. 141 at 22.) Within the Third Circuit, "hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (quoting *Stelwagon Mfg. Co v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)). Nothing suggests that counselor Christian would be unavailable to testify should this case go to trial. *See id.*; *see also McMillian v. Wetzel*, No. 18-1771, 2019 WL 5691814, at *3 (3d Cir. Nov. 4, 2019) (concluding that district court erred in determining that inmate's

affidavits, which contained hearsay, could not be considered to oppose a motion for summary judgment). Even if Defendants Mooney and Klopotoski did direct Plaintiff's transfer back to SCI Coal Township, Plaintiff has presented no evidence to support a causal connection between Plaintiff's filing of grievances and a PREA complaint and the decision to transfer him to SCI Coal Township. There is no evidence in the record to suggest that Defendants Mooney and Klopotoski knew that a transfer to SCI Coal Township would place Plaintiff in danger and chose to retaliate against him for engaging in protected activity by sending him back there. *See Abney*, 2020 WL 488893, at *7.

### c. Transfer to SCI Fayette

Next, Plaintiff alleges that Defendants Mooney, Klopotoski, Barnacle, and Wetzel retaliated against him "by approving a transfer to SCI Fayette where Plaintiff learned he had inmate separations: several." (Doc. No. 52 ¶ 106.) In his deposition, Plaintiff averred that he had an off-the-record separation with inmate Sierra, who was located at SCI Fayette. (Doc. No. 142-1 at 76-77.) Plaintiff alleged that Defendants were "purposely picking prisons where they know other inmates reside where [he] had problems." (*Id.* at 77.) Plaintiff stated further that Defendants Wetzel and Barnacle were involved because his transfer was classified as an

emergency transfer, which they had to approve. (*Id.* at 78.)  He argues that "to approve them gives them [a] culpable state of mind." (*Id.*)

Once again, Plaintiff has failed to set forth sufficient evidence suggesting that Defendants Mooney, Klopotoski, Barnacle, and Wetzel knew that he had inmate separations at SCI Fayette and were personally involved in his transfer to that institution.  Rather, the evidence before the Court establishes that these Defendants were not involved in Plaintiff's transfers.  (Doc. No. 142-2 at 93, 101, 132, 149, 169.)  Plaintiff's speculations that these Defendants were involved in his transfers are simply insufficient to create a genuine issue of material fact to survive summary judgment. *See Alexander v. Forr*, 297 F. App'x 102, 105 (3d Cir. 2008) (concluding that district court properly granted summary judgment to defendants on inmate's retaliation claim because the inmate's "allegations of causation typically amount[ed] to no more than unsupported assertions; indeed, he often appear[ed] to rely on his unwarranted belief that causation is self-evident"); *see also Williams v. Wetzel*, No. 2:16-cv-1233, 2017 WL 7691750, at *3 (W.D. Pa. Dec. 28, 2017) (concluding that plaintiff failed to state a retaliation claim against Wetzel and Barnacle because he had not alleged facts suggesting that they had him transferred to SCI Fayette because of a threatening letter he wrote).

### d. Transfer to SCI Forest

Finally, Plaintiff maintains that Defendants retaliated against him by transferring him to SCI Forest, where he had more inmate separations. (Doc. No. 52 ¶ 116.) In his deposition, Plaintiff mentioned that he had separations from inmates Arce and Connolly. (Doc. No. 142-1 at 87-88.) He averred that Defendants transferred him to SCI Forest "to keep [him] intimidated and under—and to encourage attack by inmate—inmate violence" in retaliation for Plaintiff exercising his rights to file a PREA complaint. (*Id.* at 89.) Plaintiff, however, has not presented evidence suggesting that he had any contact with inmates Arce and Connolly while at SCI Forest. Nor has Plaintiff presented any evidence to suggest that Defendants were (1) aware that he had inmate separations at SCI Forest and (2) were personally involved in his transfer to that institution. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988). In any event, Plaintiff was transferred to SCI Forest approximately two (2) years after he made the PREA complaint following Bader's assault. This period of time is not an unusually suggestive temporal proximity for causation purposes. *See Burt*, 2017 WL 4681807, at *9-10.

In sum, the Court concludes that Defendants have met their burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact as to whether Defendants retaliated against Plaintiff for filing a PREA

complaint and grievances. Accordingly, Defendants will be granted summary judgment as to Plaintiff's retaliation claims.

### 3. Plaintiff's Eighth Amendment Claims

### a. Failure to Protect

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another equates to constitutional liability for the officials responsible for that inmate's safety. *Id.* at 833-34. Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Id.*; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). Actual knowledge may be proven circumstantially in situations where the general danger was obvious. *Farmer*, 511 U.S. at 842. For example, if the prisoner

presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Id.* at 842-43. However, "a defendant can rebut a *prima facie* demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers-Capitol*, 245 F.3d at 133.

### i.    Assault by Bader

Plaintiff maintains that Defendant Fye violated his Eighth Amendment rights by failing to protect him from Bader's assault because Defendant Fye "refused to lock shut Plaintiff's cell door leaving it open for invasion which Plaintiff's assailant took advantage of prior to the sexual assault." (Doc. No. 52 ¶ 153.) Plaintiff also appears to suggest that Defendants Mahally, Zakarauskas, Demming, and Pall should be held liable for failing to protect him from Bader because they made the decision to release Bader from the RHU. (Doc. No. 155 at 33.)

Defendants do not dispute that the assault by Bader caused Plaintiff to suffer a substantial risk to his safety. Rather, they argue that Defendant Fye had no

knowledge of Bader's death threat to Plaintiff and that Defendants Mahally, Zakarauskas, Demming, and Pall cannot be held liable based upon their decision to release Bader from the RHU to a cell block separate from Plaintiff's. (Doc. No. 141 at 12-13, Doc. No. 163 at 4-5.) The evidence before the Court establishes that in August of 2014, Officer Zablotny witnessed Bader punching Plaintiff in the face. (Doc. No. 142-1 at 32-33.) Bader was subsequently moved from G block to I block. (*Id.* at 33.) On September 23, 2014, Plaintiff gave Bader's death threat to Officer Petrosky, who said he would pass it on to Defendant Pall. (*Id.* at 38.) Fifteen (15) days later, Plaintiff was attacked by Bader while Defendant Fye and Officer Levan were on duty in G block. (*Id.* at 42-48.)

With respect to Defendant Fye, Plaintiff asserts that "everyone was aware that inmate Bader was a threat to [him]" (*id.* at 48) and that it is "inconceivable at best, implausible at least, that Defendant Fye was not 'briefed' or was denied access to the officer's 'block notes' diary" regarding Bader's attack on Plaintiff in August of 2014 (Doc. No. 155 at 29). Plaintiff, however, has not provided any evidence to the Court suggesting that Defendant Fye was aware of Bader's threat to Plaintiff and deliberately ignored that threat. Plaintiff's speculations are simply insufficient to create a genuine issue of material fact with respect to Defendant Fye's alleged liability under the Eighth Amendment. *See Gans v. Mundy*, 762 F.2d 338, 341 (3d

31

Cir. 1985) (noting that "a party resisting a [Rule 56] motion cannot expect to rely merely upon base assertions, conclusory allegations or suspicions").

Likewise, there is no evidence before the Court suggesting that Defendants Mahally, Zakarauskas, Demming, and Pall were aware that their decision to release Bader from the RHU constituted a substantial risk to Plaintiff and chose to ignore that risk. The record establishes that after the investigation, Defendant Pall allowed security personnel to release Bader from the RHU so that he could return to B block. (Doc. No. 142 ¶¶ 4-5.) Plaintiff has presented no evidence suggesting that Defendants Mahally, Zakarauskas, Demming, and Pall knew that Bader would go to G block after his release from the RHU in order to assault Plaintiff. *Cf. Bistrian v. Levi*, 696 F.3d 352, 368-71 (3d Cir. 2012) (noting that placing an inmate in a locked recreational yard along with inmates against whom that inmate was cooperating with the FBI in an investigation constituted deliberate indifference). Again, Plaintiff cannot rely upon his speculations to create a genuine issue of material fact sufficient to survive summary judgment. Accordingly, the Court will grant Defendants summary judgment with respect to Plaintiff's failure to protect claim concerning the assault by Bader.

### ii.    Incidents at Other Prisons

Plaintiff also appears to suggest that Defendants are liable for failing to protect him from the assaults that occurred at other institutions.  As noted above, Plaintiff must demonstrate that Defendants actually knew or were aware of an excessive risk to his safety; it is not sufficient that they should have known of the risk.  *Id.* at 367.  As discussed below, Plaintiff has presented no evidence that creates a genuine issue of material fact regarding this claim.

As discussed above, Plaintiff has not demonstrated that Defendants were personally responsible for his various transfers to different institutions and that they were aware that he had inmate separations at these institutions.  *See Fortune v. Bitner*, 285 F. App'x 947, 950 (3d Cir. 2008) (concluding that district court properly granted summary judgment to defendants on inmate's Eighth Amendment failure to protect claim because there was no evidence that defendants had authority over inmate's transfers).  In any event, even assuming that Defendants were aware that Plaintiff had inmate separations at SCI Coal Township, SCI Fayette, and SCI Forest and were personally involved in Plaintiff's transfers to those institutions, Plaintiff has cited no evidence that Defendants were aware that these transfers would pose a risk to Plaintiff's safety and deliberately ignored that risk.  As noted above, Plaintiff was assaulted by inmate Fetterolf at SCI Coal Township and inmate Duffy at SCI

33

Fayette. Although Plaintiff suggested in his deposition that these inmates attacked

him at the behest of those with whom he had separations in place (Doc. No. 142-1

at 74-87), Plaintiff has presented no evidence suggesting that Defendants were aware

that Fetterolf and Duffy posed a risk to Plaintiff's safety. *See Bracey v. Pa. Dep't*

*of Corr.*, 571 F. App'x 75, 79 n.3 (3d Cir. 2014) (concluding that summary judgment

was proper on Eighth Amendment failure to protect claim because it was undisputed

that "there was no prior tension between [plaintiff] and his assailants, and [plaintiff]

did not allege that those assailants had a history of assaulting other inmates").[20]

Overall, Plaintiff does not cite, and the Court has not located, any cases suggesting

that deliberate indifference is demonstrated by simply transferring an inmate to an

institution where he or she has inmate separations. *See Miller v. Turner*, 26 F. App'x

560, 563-64 (7th Cir. 2001) (concluding that district court properly granted summary

judgment to defendants on inmate's failure to protect claim because "although prison

officials were aware that [plaintiff] was categorized as a separatee from certain other

inmates, the inmates who attacked him were not on that list"); *cf. Brown v. Santiago*,

No. 3:17-cv-1427 (MPS), 2017 WL 6624008, at *3 (D. Conn. Dec. 28, 2017)

(concluding that inmate stated a failure to protect claim where he was not only

---

[20] Throughout his deposition, Plaintiff referred to "off the record" separations as proof that Defendants were deliberately trying to cause him harm. (Doc. No. 142-1 at 61, 76-77, 87.) However, he provides no evidence to suggest that Defendants knew about such "off the record" separations or were responsible for their omission from Plaintiff's formal inmate separations list.

transferred to the same facility but was also placed in the same housing unit as the inmate with whom he had a separation in place).  Accordingly, because Plaintiff has not presented evidence creating a genuine issue of material fact that Defendants were deliberate indifferent to risks posed to Plaintiff by inmates at SCI Coal Township, SCI Fayette, and SCI Forest, the Court will grant Defendants summary judgment with respect to this claim.

### b.    Denial of Medical Care

Plaintiff also claims that Defendants violated his Eighth Amendment rights by refusing him medical treatment after the assault by Bader, which resulted in a kidney injury.  (Doc. No. 52 ¶ 193.)  Specifically, Plaintiff alleges that Defendant Fye denied him medical treatment after the assault that occurred on October 5, 2014. (*Id.* ¶ 158.)

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842)). Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

In his second amended complaint, Plaintiff alleges that after the assault, he asked to go to medical, but that Officer Levan refused, "saying they were minutes

away from lockdown for the night and ask 1st shift in the morning." (Doc. No. 52

¶¶ 56-57.) In support of their motion for summary judgment, Defendants have

submitted a transcript of Plaintiff's deposition. (Doc. No. 142-1.) During his

deposition, Plaintiff averred that he asked to go to medical, but was told that it was

too late. (*Id.* at 50.) He maintained that Defendant Fye and Officer Levan "told

[him] to take care of that in the morning." (*Id.*) The next morning, Plaintiff asked

Officer Bolka if he could go to medical and was told that someone would get back

to him. (*Id.* at 59.) Plaintiff did not submit a sick call slip because he did not want

to pay $5.00 for a sick call. (*Id.*) Plaintiff avers that "whenever inmates are engaged

in any kind of physical assault, it's protocol to just go to Medical." (*Id.* at 57.)

Plaintiff received medical care upon his transfer to SCI Coal Township. (*Id.* at 56.)

To the extent Plaintiff seeks to hold Defendant Fye liable for failing to follow

a DOC policy or protocol,[21] "any violation of the policy that may have occurred does

---

[21] Defendants also assert that they were not personally involved in the denial of medical care. (Doc. No. 141 at 35-36.) Here, Plaintiff's deposition testimony—that he asked Defendant Fye to go to medical and Defendant Fye told him to wait until the next morning—contradicts his verified second amended complaint, in which he averred that Officer Levan was the individual who denied him permission to go to medical. While the Court may not assess credibility at the summary judgment stage, *see Anderson*, 477 U.S. at 252, a party cannot create a genuine issue of fact by offering affidavit testimony that conflicts with prior sworn testimony. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985). Thus, it would be permissible for the Court to disregard Plaintiff's deposition testimony regarding Defendant Fye because it contradicts the sworn statements previously set forth in his second amended complaint. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-72 (7th Cir. 1996) (finding that district court properly disregarded deposition testimony that contradicted earlier clear affidavit statements and noting that this was not

not automatically give rise to a constitutional violation. The simple fact that prison regulations prescribe certain procedures does not mean that the procedures thereby acquire a federal constitutional dimension." *Williams v. Wetzel*, No. 12-944, 2014 WL 252020, at *4 (W.D. Pa. Jan. 22, 2014); *see also Delker v. Blaker*, No. 09-710, 2012 WL 726415, at *6 (W.D. Pa. Mar. 1, 2012) (noting that "the policies of the Department of Corrections and the Eighth Amendment are not the same").

In any event, Plaintiff has cited no evidence to the Court that Defendant Fye (or any of the other named Defendants) was aware of a serious risk to Plaintiff's health and consciously refused to allow him to go to medical. In his responses to Defendant's statement of material facts, Plaintiff asserts that Bader stabbed him with a sharp object and that he was holding his side when he asked Defendant Fye for assistance. (Doc. No. 148 ¶ 6; Doc. No. 170 ¶¶ 6, 9.) Plaintiff, however, presents no evidence to support his claim that Bader stabbed him with a sharp object. Plaintiff cites to his verified second amended complaint in support, but in his second amended complaint, Plaintiff avers only that he "felt a sharp stabbing pain at his lower back area, as he broke free from under the weight of inmate Bader." (Doc. No. 52 ¶ 40.) In sum, nothing in the record before the Court suggests that Plaintiff had any obvious

---

considered improper weighing of evidence). Disregarding such testimony would lead to a conclusion that Defendant Fye had no personal involvement in denying Plaintiff medical care after the assault by Bader. In any event, as discussed above, Plaintiff cannot maintain his Eighth Amendment claim regarding the denial of medical care.

or visible injuries after the assault. Plaintiff's allegations are insufficient to create a genuine issue of material fact that Defendant Fye (and the other Defendants) "consciously disregarded a serious risk to [Plaintiff's] health or prevented him from receiving necessary medical treatment." *Blanchard v. Reigle*, 439 F. App'x 102, 104 (3d Cir. 2011) (concluding same regarding inmate's claims that officers delayed his access to medical care because the inmate "was able to ambulate on the day of the accident and did not have any obvious or visible injuries"). Accordingly, the Court will grant Defendants summary judgment with respect to Plaintiff's Eighth Amendment claim concerning the denial of medical care.

### 4. Plaintiff's Fourteenth Amendment Claims

#### a. Due Process

Plaintiff further suggests that Defendants violated his due process rights because his "back-to-back-to-back institutional transfers" caused his parole recommendation to be "dubiously [revoked]." (Doc. No. 52 ¶ 183.) Plaintiff maintains that "the PA Parole Board is not the problem nor was Plaintiff, it was the intentional and malicious acts authorized by the defendants, on record or off . . . to cover up a sexual assault and silence Plaintiff who sought to speak of it, whereby his parole was squandered." (*Id.* ¶ 186.)

The Constitution does not create a protected liberty interest in a pre-release expectation of parole. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 10-11 (1979). However, "the mere grant of parole by a state parole board does not vest a prisoner with a protected liberty interest." *Capozzi v. Pa. Bd. Probation & Parole*, No. 3:17-cv-2102, 2019 WL 4309069, at *6 (M.D. Pa. July 29, 2019), *Report and Recommendation adopted*, 2019 WL 4302282 (M.D. Pa. Sept. 11, 2019). Thus, until the time when a prisoner is actually released on parole, "an unexecuted grant of parole may be rescinded by the Board without implicating procedural due process." *Id.* Thus, Plaintiff cannot maintain his procedural due process claim regarding the loss of parole. Moreover, Plaintiff has not provided any evidence to the Court establishing that Defendants were personally responsible for any revocation of a parole recommendation. *See Rode*, 845 F.2d at 1208. Accordingly, the Court will grant Defendants summary judgment with respect to this claim.

### b.    Equal Protection

Plaintiff also alleges that his equal protection rights guaranteed by the Fourteenth Amendment were violated when he was discriminated against based upon his sexual orientation. Specifically, Plaintiff alleges that Defendant Wetzel denied him equal protection because "he was not afforded the same protections [as]

40

a straight person . . . victimized in prison by sexual assault, sexual harassment or rape, then and since, Plaintiff is gay." (Doc No. 52 ¶ 148.) He also suggests that the other named Defendants violated his equal protection rights in the same way Defendant Wetzel did. (*Id.* ¶ 150.) Plaintiff further maintains that Defendant Fye violated his equal protection rights by failing to charge Bader with sexual assault, assault, or threatening bodily harm. (*Id.* ¶ 154.) According to Plaintiff, Defendant Fye did this because of his "animus towards gays and blacks in one Plaintiff." (*Id.* ¶ 155.)

The Equal Protection Clause requires all persons "similarly situated" to be treated alike by state actors. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Traditionally, "[i]n order to establish a *prima facie* case of discrimination under the Equal Protection Clause, [plaintiffs] need[] to prove that they were members of a protected class [such as race or gender] and that they received different treatment than that received by similarly-situated individuals." *See Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir. 2002).

However, where a plaintiff alleges that he alone "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," he may raise a "class of one" equal protection claim. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008). To maintain such a

41

claim, a plaintiff must establish that he has been irrationally singled out for disparate treatment. *See id.* "[A]t the very least, to state a claim under [a class of one theory], a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Mosca v. Cole*, 217 F. App'x 158, 164 (3d Cir. 2007). When alleging the existence of similarly situated individuals, plaintiffs "cannot use allegations . . . that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief," and "bald assertion[s] that other[s] . . . were treated in a dissimilar manner" will not suffice. *See Young v. New Sewickley Twp.*, 160 F. App'x 263, 266 (3d Cir. 2005) (citing *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005)).

As an initial matter, prisoners are not a protected class of individuals. *See Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001). Here, Plaintiff suggests that he was discriminated against because of his race and sexual orientation. As noted above, race is a protected class. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 n.112 (3d Cir. 2016). Sexual orientation, however, is not a suspect classification, and courts "have declined to identify homosexuals as a protected class." *Smith v. Mazvekiewicz*, No. 10-498, 2010 WL 3191894, at *2 (W.D. Pa. Aug. 11, 2010); *see also Sherrill v. City of Hoboken*, No. 16-3092 (ES) (MAH),

2020 WL 64617, at *7 (D.N.J. Jan. 6, 2020) (noting that "sexual orientation has not been recognized as a protected class under federal law"). In any event, the only evidence before the Court pertaining to other inmates is that Bader was not transferred from SCI Dallas after the assault on Plaintiff. Plaintiff provides no evidence, however, to suggest that Defendants intentionally treated him differently from other inmates based upon his sexual orientation and race or treated other inmates more favorably in any respect. Moreover, to the extent Plaintiff asserts that Defendant Fye denied him equal protection by failing to charge Bader with more serious offenses in the misconduct report, Plaintiff has no cognizable interest in having Bader prosecuted for such offenses. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (noting that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Hill v. Higgins*, No. 05-6032 (GEB), 2006 WL 208559, at *5 (D.N.J. Jan. 26, 2006) (concluding that inmate plaintiff could not maintain an equal protection claim on the basis that a lieutenant failed to pursue or file criminal charges against another lieutenant). Plaintiff's allegations that his equal protection rights were violated are simply "bald assertions" that fail to set forth a genuine issue of material fact with respect to Defendants'

treatment of him.  Accordingly, the Court will grant Defendants summary judgment with respect to Plaintiff's equal protection claims.[22]

### 5.    Plaintiff's Conspiracy Claims

Plaintiff maintains further that Defendants entered a civil conspiracy to violate his civil rights, referring to a "cabal" throughout his second amended complaint. (*See* Doc. No. 52.)  To maintain an action for civil conspiracy under § 1983, a plaintiff must show "both the deprivation of a constitutional right and the existence of a conspiracy to violate that right."  *Wodarski v. Erie Office of Children & Youth Servs.*, No. 10-292, 2012 WL 602933, at *4 (W.D. Pa. Feb. 23, 2012).  As addressed in detail above, the Court has concluded that Defendants are entitled to summary

---

[22] Plaintiff vaguely suggests that Defendant Fye "outed" him to other G block inmates who were unaware of his sexual orientation, in violation of "the Privacy Act under the Equal Protection Clause of the 14th Amendment."  (Doc. No. 52 ¶ 159.)  To the extent that Plaintiff is raising a claim under the Privacy Act, 5 U.S.C. § 552a, that Act applies to agencies not individuals, *see Walsh v. United States*, No. 1:05-cv-818, 2006 WL 2346420, at *1 (M.D. Pa. Aug. 11, 2006), and "there is no private cause of action under the Privacy Act against a municipal or state agency," *N'Jai v. Pittsburgh Bd. of Public Educ.*, 487 F. App'x 735, 737 (3d Cir. 2012).

The Third Circuit has concluded that an individual's "sexual orientation [is] an intimate aspect of his personality entitled to privacy protection."  *See Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000).  In *Sterling*, however, the individual was threatened with the forced disclosure of his sexual orientation to individuals from whom it had intentionally been kept secret.  *Id.* at 192-93.  Here, Plaintiff has presented no evidence to suggest that he kept his sexual orientation secret.  Rather, in his second amended complaint, Plaintiff readily states that he is a homosexual and that his "penological record has classified his sexuality for 16 years."  (Doc. No. 52 ¶ 148.)  Thus, to the extent Plaintiff is asserting a violation of his privacy rights against Defendant Fye, the Court concludes that Defendants are entitled to summary judgment on this claim as well.  *See Abdullah v. Fetrow*, No. 1:05-cv-1135, 2007 WL 2844960, at *13 (M.D. Pa. Sept. 26, 2007) (granting summary judgment to defendants on right to privacy claim because plaintiff had presented no evidence that he kept his sexual orientation secret).

judgment on Plaintiff's constitutional claims because there is no evidence in the record before the Court that Plaintiff's constitutional rights were violated. It follows, therefore, that in the absence of an actual violation of a constitutional right under § 1983, Plaintiff's conspiracy claim necessarily fails. *See Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011) ("As a threshold matter, . . . a § 1983 conspiracy claim only arises when there has been an actual deprivation of a right."); *Gibbs v. Harsky*, No. 98-787 JJF, 2004 WL 1328278, at *3 (D. Del. Mar. 31, 2004) ("Without an underlying constitutional injury, a plaintiff cannot succeed on a civil conspiracy claim pursuant to Section 1983."), *aff'd*, 122 F. App'x 597 (3d Cir. 2005).

Moreover, to maintain a civil conspiracy claim, "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa. 1992). The plaintiff's allegations "must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives." *Id.* A plaintiff cannot rely on subjective suspicions and unsupported speculation. *Young v. Kann*, 926 F.2d 1396, 1405 n.16

(3d Cir. 1991).  Moreover, "to successfully counter a motion for summary judgment, a plaintiff must provide specific evidence establishing that defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose." *Payne v. Gordon*, 3:17-cv-1230, 2018 WL 3649026, at *11 (M.D. Pa. Aug. 1, 2018).

Here, the Court agrees with Defendants that Plaintiff has failed to introduce into the record any evidence which shows an agreement or plan created and executed by Defendants that rises to the level of a conspiracy.  Plaintiff's only specific mention of conspiracy in his second amended complaint accuses Defendants of conspiring with SCI Camp Hill staff to seize Plaintiff's legal property, which resulted in him missing a deadline to respond to Defendants' motion to dismiss previously filed in this case.  (Doc. No. 52 ¶ 178.)  He also suggests that Defendants conspired against him because they used to work together or used to work at SCI Dallas.  (Doc. No. 142-1 at 70-72.)  These assertions, however, fail to reasonably suggest the presence of an agreement or concerted activity between Defendants. Without more, Plaintiff's conspiracy claim amounts to nothing more than mere conjecture and bare speculation, which is not sufficient to demonstrate a genuine issue of fact as to the existence of an agreement designed to deny his constitutional

rights. *See Young*, 926 F.2d at 1405 n.16. Accordingly, the Court will grant summary judgment to Defendants as to Plaintiff's conspiracy claim.[23]

### 6. Plaintiff's PREA Claims

Plaintiff also appears to raise claims against Defendants based upon their handling of his PREA complaint, asserting that their violations of the PREA also constitute an Eighth Amendment violation. (Doc. No. 52 ¶¶ 147, 151.) However, "[w]hile the PREA was intended in part to increase the accountability of prison officials and to protect the Eighth Amendment rights of Federal, State, and local prisoners, nothing in the language of the statute establishes a private right of action." *Walsh v. N.J. Dep't of Corr.*, No. 17-2442, 2017 WL 3835666, at *4 (D.N.J. Aug. 31, 2017); *see also Krieg v. Steele*, 599 F. App'x 231, 232 (5th Cir. 2015) (noting that "other courts addressing this issue have found that the PREA does not establish a private cause of action for allegations of prison rape"); *Frederick v. Snyder Cty. Prison*, No. 3:18-cv-707, 2019 WL 1348436, at *4 (M.D. Pa. Mar. 22, 2019) (concluding same). Thus, Plaintiff cannot "bring a private action to enforce

---

[23] Defendants also assert that they could not have conspired together as a matter of law because they are all employees or officials of the DOC. (Doc. No. 141 at 29.) It is unclear, however, whether this intracorporate conspiracy doctrine applies to civil conspiracy claims brought under § 1983. To the extent that Plaintiff's civil conspiracy claim is brought under Pennsylvania law, however, state law makes clear that "a single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Grose v. Proctor & Gamble Paper Prods.*, 866 A.2d 437, 441 (Pa. Super. Ct. 2005) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)).

obligations set forth in the PREA, whether through the statute itself or through [an] attempt to enforce the DOC PREA policy via section 1983." *Bowens v. Employees of the Dep't of Corr.*, No. 14-2689, 2016 WL 3269580, at *3 (E.D. Pa. June 15, 2016), *aff'd*, *Bowens v. Wetzel*, 674 F. App'x 133, 137 (3d Cir. 2017) (agreeing that a plaintiff "may not attempt to enforce statutes of policies that do not themselves create a private right of action by bootstrapping such standards into a constitutional deliberate indifference claim"). Moreover, to the extent Plaintiff challenges the quality of the investigation into his PREA complaint, he has no freestanding constitutional right to such an investigation. *See Graw v. Fantasky*, 68 F. App'x 378, 383 (3d Cir. 2003) ("[A]n allegation of a failure to investigate, without another recognizable constitutional right, is not sufficient to sustain a section 1983 claim."). Accordingly, because Plaintiff cannot maintain his claims premised upon violations of the PREA, the Court will grant summary judgment to Defendants as to such claims.

### 7. Plaintiff's Claims Under the Pennsylvania Crimes Code

Plaintiff suggests that Defendants are liable to him for committing various offenses set forth in the Pennsylvania Crimes Code, including official oppression, tampering with public records, retaliation, tampering with evidence, theft, and indirect criminal contempt. (Doc. No. 52 ¶¶ 172-178.) Pennsylvania courts "have

48

on occasion recognized that tort liability may be imposed for Crimes Code violations" and that the "same conduct that constitutes a violation of a criminal statute may also form the basis for a separate civil claim." *D'Errico v. DeFazio*, 763 A.2d 424, 430 (Pa. Super. Ct. 2000). Here, however, Plaintiff "do[es] not seek redress under general negligence or other well-established common law principles[;] instead, [he] seek[s] to impose civil liability based on the criminal statute[s] [themselves]." *Id.* Plaintiff does not point to, and the Court has not located, any indications that there are private causes of action for the various crimes Plaintiff believes Defendants committed. *See, e.g.*, *Bullock v. Bimbo Bakeries USA*, No. 1:09-cv-1902, 2010 WL 1753643, at *5 (M.D. Pa. Feb. 4, 2010) (concluding that plaintiff could not maintain a private cause of action for alleged theft crimes under Pennsylvania law), *Report and Recommendation adopted by* 2010 WL 1753770 (Apr. 27, 2010). The Court will, therefore, grant Defendants summary judgment with respect to Plaintiff's claims based upon the Pennsylvania Crimes Code.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motions for leave to amend (Doc. Nos. 156, 157) his brief in opposition will be granted. Defendants' motion for summary judgment (Doc. No. 140) will be granted. An appropriate Order follows.

<u>s/Sylvia H. Rambo</u>
Sylvia H. Rambo
United States District Judge

Dated: February 6, 2020